## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 23 2020, 9:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Diamond Z. Wittlief
Carmel, Indiana

ATTORNEY FOR APPELLEE

Jay T. Hirschauer
Hirschauer & Hirschauer
Logansport, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Diamond Z. Wittlief, *Appellant-Petitioner,* | October 23, 2020 |
| | Court of Appeals Case No. 19A-DC-2647 |
| v. | Appeal from the Hamilton Superior Court |
| Tom F. Hirschauer, III, *Appellee-Respondent* | The Honorable Darren J. Murphy, Magistrate |
| | Trial Court Cause No. 29D01-1208-DR-8515 |

**Weissmann, Judge.**

[1] Diamond K. Wittlief (Mother) and Tom F. Hirschauer, III, (Father), have been divorced for many years and, in the seven years since their dissolution decree was entered, have continued to litigate myriad disputes at a somewhat breathtaking pace. In this appeal (as opposed to the many other appeals filed by Mother and dismissed by this Court), Mother appeals the trial court's order relating to the parties' requests regarding child support, extracurricular activities, and uninsured medical expenses. We affirm and remand with instructions to: (1) reconsider whether Father should be given an income credit for Child's tuition costs and make findings on the issue as directed herein; and (2) reconsider its modification of the extracurricular activities provision of the parties' mediated settlement agreement and make findings regarding Child's best interests as related to extracurricular activities.

## Facts

[2] Mother and Father were married, and one child (Child) was born of the marriage in September 2010. Mother and Father divorced, and on May 6, 2013, the trial court adopted their mediated settlement agreement, pursuant to which the parents shared joint legal custody and Mother had primary physical custody. Father received 156 annual overnights with Child.

[3] In the years following the settlement agreement, the parties continued to litigate extensively. At the outset of the hearing from which this appeal stems, the trial court noted that "this file has been churned in an incredible way over the last few years and it was difficult for me to discern exactly what we're hearing today

and when it was filed." Tr. Vol. II p. 3; *see also id.* at 76 (trial court observing that Mother is a "prolific filer of motions" and commenting on the "shear [sic] frequency of motions that have been filed in this case"). Included in the extensive litigation were at least four prior appeals filed by Mother—but she failed to perfect any of them, and they were all eventually dismissed.

[4] Having read the record and the trial court's order, we agree with the trial court that the matters at issue at this time are: "child support, the ratio of contribution for extracurricular activities[,] and uninsured medical expenses." Appealed Order p. 1. We will recount only the facts relevant to these specific issues.

[5] On July 31, 2017, Mother filed a petition for modification of child support.[1] In relevant part, she argued as follows: (1) Mother and her husband had become permanent custodians of another child and she should receive credit for that child; (2) Father's income was higher than the child support calculation indicated; (3) Father should not have received credit for providing health insurance coverage for Child because he did not provide the insurance card to Mother or Child's healthcare providers; and (4) Mother's income had substantially decreased because of a disability, and at the time of the motion, her income consisted solely of Social Security benefits in the amount of $314.50 per week.

---

[1] The motion also included a request to modify parenting time, but the trial court did not consider that issue because one of Mother's appeals, which related to parenting time and custody issues, was still pending at the time of the relevant hearings.

[6] On August 18, 2017, Mother filed a motion to find Father in contempt. In relevant part, she argued that Father had failed to pay his portion of Child's extracurricular expenses, failed to provide her with Child's health insurance card, and failed to reimburse Mother for uninsured medical expenses.

[7] On August 24, 2017, Father filed a motion to find Mother in contempt for failing to pay child support. Specifically, she was required by a December 2015 court order to pay $57 per week, and Father alleged that she had failed to pay any child support since October 2016. Mother responded that the December 2015 order was based on fraud and that the garnishment percentage, which amounted to over 50% of her weekly income, exceeded statutory limits.

[8] There were lengthy discovery-related delays during the litigation of these motions. Therefore, on November 28, 2018, the trial court entered an order of temporary child support, requiring Father to pay child support in the weekly amount of $200 until a final child support order could be entered. On March 13, 2019, Mother filed a new motion to find Father in contempt, alleging that he was $715.25 behind in child support payments as required by the temporary order and that he was continuing to fail to pay his share of Child's extracurricular expenses, totaling nearly $700.

[9]     The trial court held an evidentiary hearing on the pending motions on February 4 and July 15, 2019.  On October 11, 2019, the trial court issued an order on the motions.  In relevant part, it found and ordered as follows:[2]

*I.  Extracurricular Expenses*

1.      The parties' Mediated Settlement Agreement . . . provides that [Child] may participate in three activities one time per week and the parties shall proportionally contribute to the expenses of these activities based on income.

***

3.      [Mother's] position is that she became unemployed in October 2016 and eventually received disability benefits from the United States Social Security Administration. Thus, the income ratio of 52% for Father and 48% for Mother has changed and should be reconfigured and retroactively applied . . . .

4.      . . . Father kept his payments at the 52% ratio as ordered . . . [on] December 3, 2015.

***

---

[2] Normally, we prefer not to quote so extensively from trial court orders.  But given the confusing and complex nature of these proceedings and the trial court's thorough exploration of the history and issues before it, we believe it appropriate in this case.

7. Mother's request for relief is that the Court retroactively apply a new ratio for payment of extracurricular activities to the date she lost her employment . . . .

8. Mother's motion to modify the payment of extracurricular activities wasn't even filed until August 18, 2017.

\*\*\*

16. Father is self-employed. His income is going to fluctuate wildly from year to year. Mother's income is flat. The only income directly attributable to her is her SSD.

\*\*\*

19. Father testified that Mother had the child in extracurricular activities as many as 6 days a week at one point. Currently, the child is in extracurricular activities only three days a week but with multiple activities each day.

\*\*\*

23. The Court finds Father's law firm distributes salary to Father on a quarterly basis and has since he joined in 2015.

\*\*\*

25. The Court finds that Father pays his share of the extracurricular expenses incurred by his son on a quarterly basis when salary is distributed to him by his law firm.

*** 

28. The difference between what Father was ordered to pay and what Father actually paid is $156. There was no evidence received by the Court that Father willfully and wantonly disregarded this Court's order regarding extracurricular activities. There was significant evidence that Mother expected immediate payment . . . despite clear communication to her for years that Father only gets paid on a quarterly basis.

29. There was significant evidence that Mother overuses the extracurricular activity provision . . . despite the significant reduction in her income due to being adjudicated disabled.

30. Mother's Motion seeking to hold Father in contempt for nonpayment of extracurricular activities is DENIED. The $156 owed by Father . . . shall be addressed below.

## II. Uninsured Medical Expenses

### a. Nonpayment

*** 

32. . . . In [the controlling] Order, Mother is responsible for the first $907.92 of uninsured medical expenses for the child. Thereafter, Mother shall pay 43% and Father 57% . . . each year.

***

34. Mother seeks payment of uninsured medical expenses dating back to 2016. . . . The Court found [Mother's supporting] exhibits were hearsay, as they lacked the required business record affidavit, and did not admit the documents. Thus, the Court did not receive evidence upon which the Court could base a decision on how much uninsured medical expenses were incurred by Mother. The Court also did not receive sufficient evidence as to when Mother satisfied the 6% rule for her share . . . .

35. Mother further acknowledged that she was unaware Father had paid for some of her claimed uninsured health expenses directly . . . .

***

37. Mother repeatedly stated that she possessed emails explaining to Father when she hit the 6% rule amount and that she provided proof of payment for her expenses to Father for reimbursement. These emails, however, were never offered or admitted for the Court to consider as evidence.

38. As a result, Mother's [claim regarding] uninsured medical expenses fails for lack of evidence . . . .

39. Mother's Motion to find Father in contempt for nonpayment of uninsured medical expenses is DENIED.

***

### B. Failure to Maintain Health Insurance

40.    . . . Mother claims Father should be held in contempt because he let the health insurance he was ordered to provide [for Child] lapse at some point.

***

43.    According to Mother, in March 2018 Father obtained health insurance as required but the insurance only covers emergencies and accidents. It did not cover occupational, speech or physical therapy that the child requires . . . .

***

45.    The Court finds that neither the original Decree nor [an order from November 2015] dictate specific types of coverage which must be included in Father's health insurance plan. Thus, Father cannot be held in contempt by this Court for [] having [a] health insurance plan which does not cover occupational, speech or physical therapy.

***

50.    The Court finds that Father's failure to cover the child with a health insurance plan was related to changing marketplace plans and coverage caused by him leaving government employment, entering a small law firm practice and alteration of coverage by the provider.

51.    The Court does not find a willful, wanton disregard for [the November 2015 order].

52.    The Court finds that Mother continued her primary coverage on the child so the child had health insurance

throughout the entire time period contained in Mother's motion.

***

54. Mother's request to hold Father in contempt is a request without a remedy. Father obtained health insurance again eleven months prior to the first hearing on Mother's motion. Mother had coverage for the child through Father's gap period from her subsequent spouse. . . .

55. Mother's motion seeking to hold Father in contempt for not maintaining health insurance is DENIED.

*IV. Child Support*

*a. Retroactive Application of New Child Support Amount*

56. Mother seeks a modification of child support in her August 1, 2017 *Motion to Modify* backdated to the date she was adjudicated as disabled and started receiving SSD disability income on October 31, 2016.

57. The Court is without legal authority to retroactively apply a child support modification for the time period prior to Mother filing her child support modification motion. . . .

***

59. . . . [W]hile this Court may choose to grant Mother's request for relation back to the filing date of August 1, 2017, Mother has no statutory entitlement to such.

60.    . . . [T]he Court notes Mother remarried in July 2014. Evidence received by the Court indicates Mother's spouse earns income of between $165,000 and $185,000 during the years this Court was asked to review.

61.    . . . [T]he Court received evidence regarding Mother's travel during the time period for which this Court was asked to review which included a trip to the Mexican Riviera in January, 2018, a European vacation in April 2018, a trip to Washington, D.C. in May 2018, a trip to New York [C]ity, a multiday trip to California in June 2018, and a four week tour of national parks in the western United States in 2018.  Mother is not suffering financially.

***

65.    Father would be significantly prejudiced by a retroactive application of a child support [recalculation] due to the change in ratios for extracurricular activities, change in the 6% rule for uninsured medical expenses and a massive arrearage in child support for a two-year retroactive application.

66.    Mother has not shown a prejudice to her if the Court does not retroactively apply the modification.

***

68.    The Court finds the appropriate date to apply the child support modification is the first Friday after this Order is filed, which is Friday, October 11, 2019.

*b. Overnights*

***

71.    In previous orders and the current controlling child support order, this Court has credited Father with 156 overnights.

***

75.    Mother . . . hotly disputed the number of overnights that Father should be credited . . . because Father's expenses for child are in some cases covered by the paternal grandparents.

76.    . . . Mother's position is paternal grandparents occasionally feed the child, transport the child and pay for clothing during Father's parenting time. Therefore, Father's overnight credit should be reduced[.]

77.    Father testified that the child, when it is Father's parenting time, may spend the night with the child's paternal grandparents once a month or maybe once every other month. . . .

78.    Mother believes that, because Father is relieved of the expense for feeding and caring for the child during the nights when the child spends the night at paternal grandparents, Father should not receive credit for these overnights. . . .

79.    Mother also seeks to further reduce Father's overnight credit because Father and [C]hild hav[e] weekly brunches with paternal grandparents. The evidence is that at these brunches, the paternal grandparents will pay for some if not all of the food used in this meal . . . .

80. Mother further seeks to reduce Father's overnight credit because paternal grandmother transports the child . . . and also buys the child clothing.

*** 

83. The Court finds that any provision of clothing to the child . . . is a *de minimus* [sic] concern. . . .

84. Although it is clear that paternal grandparents contribute to the weekly brunch . . . , the Court finds the evidence insufficient as to how much this meal reduces Father's costs for caring for the child.

85. The same is true for transportation. . . .

86. Mother refuses to take into consideration the fact that Father solely pays $561 per month for ten months of the year to educate the child at a private school, St. Luke's Catholic School. . . . Father also solely pays for the child's school uniforms . . . . Mother objects to the child attending private school . . . . As education is a controlled expense for which Mother would normally be responsible, and because this controlled expense has now been transferred to Father, the Court feels it appropriate to consider Father's educational expenses when considering Mother's request to reduce Father's overnight credits for assistance he may receive from the paternal grandparents.

87. The Court finds Father's assumption of the controlled expenses for education vastly dwarfs and outweighs any incidental assistance Father may receive from the paternal grandparents . . . .

88.  The Court finds Father shall continue to receive 156 overnights for child support calculation purposes . . . .

### c. Subsequent Born Child Credit

89.  Mother . . . requests that she be given credit for a subsequent child . . . .

90.  [A Kentucky trial court order] placed the daughter of Mother's current spouse's cousin with [Mother] and her husband. . . .

\*\*\*

95.  The real dispute in this case is whether the [Kentucky trial court order] constitutes a legal adoption of [S.B.]

\*\*\*

99.  The Court finds the [Kentucky trial court order] does *not* create a legal adoption.  It is equivalent to a CHINS nonparental placement order.

100.  Because [S.B.] was neither born to Mother nor legally adopted . . . , the Court is without authority to credit Mother with a subsequent child multiplier credit . . . .

### d. Father's Income

101.  Father is self-employed at [a] law firm . . . .

102.	Father testified that he just received his partnership Schedule K-1 for calendar year 2018 one week prior to the July 15, 2019 hearing. . . . Father's 2018 K-1 indicates Father's self-employed earnings as $139,826.

103.	Mother obtained Father's personal bank account information through discovery and reported net deposits for Father in 2018 as $178,000. Mother requests that the Court use $178,000 as Father's annual gross income for child support purposes.

104.	Father testified that the net deposits in his bank account include reimbursements from the law firm for expenses he incurred during his practice such as deposition costs, etc. Father also testified that he received a loan from his parents during 2018 to cover Father's tax debt which was deposited into this bank account. . . .

105.	. . . [Father's] net deposits into his bank account include things the Court cannot include in its calculation of child support.

106.	The Court finds Father's testimony that money he received from his parents in 2018 [was] a loan to assist Father with his tax debt to be credible . . . .

***

108.	The court finds Father's weekly gross income is *$2,689*. ($139,826 annually divided by 52 weeks in a year = $2,689).

***

*e. Mother's Income*

110. Mother's income is as difficult to gauge as Father's.

111. Mother was determined to be disabled and began to draw SSD in October 2016.

***

114. Mother's $18,038 SSD income annually divided by 52 weeks a year = $346 a week in income directly attributable to Mother.

***

125. The Court attributes to Mother only her weekly gross income obtained from her SSD benefits in the amount of $346 a week.

***

130. The Child Support Obligation Worksheet attached to this Order recommends that Father shall pay Mother $235.00 per week in child support.

131. Mother has satisfied her burden that her disability . . . represents a substantial and continuing change of circumstances which renders the prior child support order unreasonable. The amount of the change in the Court's CSOW is also greater than twenty (20) percent.

132. The Court finds it necessary to deviate downward from the recommended $235 in the CSOW due to Father's

assumption of the entire [$5,610] 2018 tuition cost for the child's education and entire school uniform cost for the child. The Court deviates downward by $35 per week.

133. Father is ordered to pay mother $200 per week in child support effective Friday, October 11, 2019.

134. The Court notes that it considered Mother's request to reduce her gross weekly income for her own uninsured medical expense and rejected it due to the income of her household. . . . The Court considered her argument about Father's expenses related to his girlfriend and rejected it as those items were not business deductions but were paid for with his income earnings which the Court has already factored into Father's gross weekly income calculation.

*g. Child Support Arrearage for Father*

135. The Court finds Father current with his child support as of the date of the last hearing, July 15, 2019. No arrearage is found for Father.

*h. Child Support Arrearage for Mother*

136. The Court finds that Mother, when she was required to pay Father support, didn't pay the support as ordered. The Court finds Mother in arrears in the amount of $1,953. This evidence was unrebutted.

137. Father did not ask this Court to find Mother in contempt for this arrearage. Father only asks for a credit of $1,953.

138. The Court credits Father $1,953. Father's child support obligation will be abated until this credit is reduced to zero.

*It is Therefore Ordered That:*

\*\*\*

9. The Court orders ¶ 3.04 of the *Decree* is modified . . . . The Court received bountiful evidence that the child has been placed in way more activities than were ever contemplated at the time of the *Decree*. Moving forward for all activities for which the child is enrolled after the effective date of this order, Father shall only be responsible for those activities with which he consents *in writing* prior to enrollment. . . . Mother may choose to enroll the child in activities for which Father doesn't consent but she shall be solely responsible for the costs of that activity without contribution from Father.

Appealed Order p. 1-38 (emphases original, some internal citations omitted). Mother now appeals.

# Discussion and Decision

[10] Mother argues that the trial court erred in multiple ways with respect to its calculation of child support and its rulings related to Child's extracurricular activities and uninsured medical expenses.

[11] Our Supreme Court has articulated the well-established standard of review for family law matters as follows:

When reviewing judgments with findings of fact and conclusions of law, Indiana's appellate courts "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. Appellate deference to the determinations of our trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time. Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children.

*Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011) (some internal citations and internal quotation marks omitted). As always, we apply a de novo standard of review to issues of law. *Redd v. Redd*, 901 N.E.2d 545, 549 (Ind. Ct. App. 2009).

# I. Child Support

[12] On the issue of child support, Mother argues that the trial court erred in calculating her income and the credits due to her, calculating Father's income and the credits due to him, and finding that Father does not have, and Mother does have, a child support arrearage.

# A. Mother's Income and Credits

## 1. Retroactivity

[13] There is no dispute that Mother has been disabled and unable to work since October 2016. The only income she receives is her Social Security Disability benefits, which totaled $18,038 (or $346 per week) in 2018.[3] The trial court attributed to Mother a weekly income of $346, with which she does not quarrel.

[14] What Mother does find fault with, however, is the trial court's refusal to apply this income retroactively to October 31, 2016, the date of her disability. The trial court observed that Mother did not file her petition to modify child support until July 31, 2017. As such, the very earliest that the income calculation could apply retroactively is July 31, 2017. *See Becker v. Becker*, 902 N.E.2d 818, 820 (Ind. 2009) (holding that "[t]he modification of a support obligation may only relate back to the date the petition to modify was filed, and not an earlier date").

[15] *Becker* holds that modification retroactive to a date prior to filing of the petition to modify is permitted in two instances: (1) when the parties have agreed to and carried out an alternative method of payment which substantially complies with the spirit of the decree; or (2) the obligated parent takes the child into the obligated parent's home and assumes custody, provides necessities, and

---

[3] Father argued below that the income of Mother's husband should be imputed to her. The trial court, however, declined to do so, *see* Appealed Order p. 32-33, and Father did not appeal that portion of the order. Therefore, we will not consider that issue.

exercises parental control for a period of time that a permanent change of custody is exercised. *Id.* Mother relies on neither of those instances in arguing for an exception to our well-settled rule prohibiting retroactive modification of child support. The trial court did not err.

## 2. Subsequent Born Child Credit

[16] Next, Mother argues that the trial court erred by refusing to give her a credit for a subsequent born or adopted child. According to Mother, S.B. is her husband's cousin's daughter. S.B. was in the custody of the Department of Child Services in Kentucky and was part of a child in need of services case. She was placed in relative care with Mother and her husband in January 2016, and in June 2016, the Kentucky family court entered an order awarding permanent custody of S.B. to Mother and her husband. Tr. Ex. Vol. IV p. 45-47. The order was not an adoption order—Mother and her husband are S.B.'s permanent custodians, not her adoptive parents.

[17] Indiana Child Support Guideline 3C(1) provides that a parent's weekly income shall be adjusted for "parents who have a legal duty or court order to support children [] born or legally adopted subsequent to the birthdates(s) [sic] of the child(ren) subject of the child support order . . . ." Mother argues that her weekly income should be adjusted based on S.B.'s placement in her permanent custody.

[18] We cannot agree. The plain language of this guideline refers only to "Subsequent-born or Legally Adopted Child(ren)," and makes no mention of

any other custody arrangements that would qualify for the adjustment. Child Supp. G. 3C(1). Had our Supreme Court intended to encompass situations beyond subsequently born or legally adopted children, it could have done so. Given that it did not, the trial court did not err by denying Mother's request for a credit based on the permanent custody order.

## 3. Credit for Mother's and Child's Uninsured Medical Expenses

Next, Mother argues that the trial court erred by denying her request to adjust her weekly income based on her own and Child's substantial uninsured medical expenses. She directs our attention to Child Support Guideline 3D(3), which indeed permits a parent's income to be adjusted for extraordinary health care expenses.

With respect to Child's uninsured medical expenses, Mother does not shoulder that burden alone. Father pays a share of those expenses that is proportionate to the parties' incomes and, as we find below, there is no evidence that he has been anything other than current with respect to paying his portion.

With respect to Mother's own expenses, she testified that her uninsured medical expenses average approximately $1,840 per year. The trial court "considered Mother's request to reduce her gross weekly income for her own uninsured medical expense[s] and rejected it due to the income of her household." Appealed Order p. 35. As noted above, while the evidence in the record is not wholly clear on the precise income made by Mother's husband, it is clear that

he earns enough money to keep Mother and Child comfortable and to maintain the standard of living to which Child was accustomed prior to the divorce. And as always, decisions that require weighing the evidence are solidly within the trial court's discretion. *See Best*, 941 N.E.2d at 502. We find that the trial court did not err by deciding not to credit Mother for her own or Child's uninsured medical expenses.

## B. Father's Income and Credits

## 1. Income

[22] Mother argues that the trial court erroneously calculated Father's income. Father is self-employed as a partner at a law firm. Father offered into evidence his Schedule K-1 for calendar year 2018, which showed that he earned $139,826 in 2018. The trial court found, based on the K-1, that Father's weekly income totals $2,689 ($139,826 divided by 52 weeks in a year).

[23] Mother argues that the trial court should have recalculated Father's income based on evidence she offered showing net deposits in Father's bank account in 2018 totaled $178,000. Therefore, she maintains that Father's annual income should be $178,000 rather than $139,826.[4]

[24] Father explained that the following transactions are included in those deposits:

---

[4] Mother also argued that money given to Father by his parents in 2017 for a down payment on a house should be factored in. But the trial court noted that because it was not applying its calculation retroactively, it would focus only on the parties' 2018 income. We find no error in this regard.

- Reimbursement from the law firm for business expenses, such as deposition costs.
- A 2018 loan from his parents to cover Father's tax debt.

The trial court agreed that business expense reimbursements may not be included in a child support calculation. And the court specifically found credible Father's testimony that the money he received from his parents was a loan because: (1) at least two checks show he repaid some money to his parents; and (2) Father is a licensed attorney who would risk professional ramifications if he lied in court. We cannot and will not second-guess the trial court's assessment of Father's credibility. Aside from the bank account statements, the only evidence regarding Father's income was the Schedule K-1, and the trial court did not err by relying on the income reflected in that document in calculating Father's income for child support purposes.

## 2. Credit for Overnights

Next, Mother argues that the trial court erroneously calculated the number of annual overnights that Father has with Child. *See* Ind. Child Support Guideline 6 (providing that a "credit should be awarded for the number of overnights each year that the child(ren) spend with the noncustodial parent"). The Commentary to Child Support Guideline 6 notes that an overnight should include "the costs of feeding and transporting the child, attending to school work and the like. Merely providing a child with a place to sleep in order to obtain a credit is prohibited."

Mother does not seem to dispute that Child actually spends the night with Father for approximately 156 nights per year. Instead, she argues that the number should be downgraded because of the following assistance provided by Child's paternal grandparents:

- Child occasionally spends the night with his paternal grandparents during Father's parenting time. This occurs approximately once a month or once every other month.
- Father and Child have weekly brunch with paternal grandparents, who sometimes pay for some or all the food for those meals.
- Paternal grandmother drives Child to Mother's house in the morning after Father's parenting time and picks Child up from his occupational therapy appointments.
- Paternal grandmother occasionally buys Child clothing.

Mother argues that Father's parenting time should be reduced by eighteen overnights for the time Child spends at paternal grandparents' house and by another fifty overnights for the brunches, transportation, and clothing.

[27] This evidence certainly shows that paternal grandparents and Child have a strong bond, that they love him and their son, and that they are there as a support for the family unit. This evidence does *not* show that Father is "merely providing the child with a place to sleep" during his parenting time. Child Supp. G. 6 Cmt. Moreover, even if the evidence more compellingly showed that paternal grandparents were providing a substantial financial help to Father's support of Child, there is no evidence in the record showing how much the overnights, weekly brunches, transportation help, and clothing purchases

actually reduce Father's costs of caring for Child.[5] Therefore, we find no error with respect to the trial court's denial of Mother's request to decrease the number of overnights Father is credited for spending with Child.

## 3. Credit for Tuition

[28] Next, Mother argues that the trial court erred by giving Father credit for the tuition he pays for Child to attend a private school. The trial court noted that Father assumed "the entire [$5610] 2018 tuition cost for the child's education and entire school uniform cost for the child." Appealed Order p. 34. As a result of that credit, the trial court deviated downward from what the Child Support Worksheet showed Father's weekly support obligation would be—$235—to a total of $200 per week.

[29] Mother objects to Child's enrollment at the private school. Mother lives in Carmel, which she believes has a public school system that can provide a comparable education at little to no cost. Therefore, she insists that Father should not be credited for this substantial expense, which she believes is unnecessary.

[30] Indiana Child Support Guideline 8 provides that extraordinary educational expenses for elementary or secondary education may be factored into the

---

[5] The trial court also notes that Father has assumed the sole responsibility of paying for Child's private school tuition and uniforms, which totals over $5610 per year. This evidence shows that Father is far from shirking his financial obligation to care for Child—if anything, he is going above and beyond what is required.

parents' respective child support obligations. The Commentary states that "[i]f the expenses are related to elementary or secondary education, the court may want to consider whether the expense is the result of a personal preference of one parent or whether both parents concur . . . and whether or not education of the same or higher quality is available at less cost." *See also Sims v. Sims*, 770 N.E.2d 860, 864 (Ind. Ct. App. 2002) (remanding child support order to trial court where trial court awarded extraordinary educational expenses but did not enter written findings in support of the order).

[31] While Guideline 8 does not explicitly require the trial court to consider the above factors, we believe it is the best practice to do so, especially in a case like this one where: (1) Father apparently concedes that the quality of education offered by the Carmel public school system is equivalent to that offered by Child's private school; and (2) the trial court's order resulted in a deviation downward from the amount reflected in the Child Support Worksheet. Therefore, we are remanding with instructions for the trial court to make explicit findings on (1) the personal preferences of Mother and Father as to Child's education; (2) the respective quality of education provided by the Carmel public school system and the private school that Child attends; (3) the best interests of Child as related to education; and (4) if the trial court still provides Father with a weekly credit of $35, a rationale for that decision, given Mother's objections.

## C. Mother's Arrearage

Before Mother became disabled, she was employed and required to pay child support. It is undisputed that she is in arrears in the amount of $1,953. As noted above, the trial court may not apply a retroactive change in child support relating back to a date prior to the filing of the motion to modify. Furthermore, it is well established that "after support obligations have accrued, a court may not retroactively reduce or eliminate such obligations." *Becker*, 902 N.E.2d at 820.

Mother argues that after she lost her employment in 2016, her weekly child support payments exceeded 50% of her disposable income, which violates a federal statute. Had she filed a motion to modify at that time and made that argument, her argument may well have succeeded. But because she did not do so, she accrued an arrearage that may not now be abated. *Id.* Therefore, the trial court did not err by awarding a credit to Father in the amount of Mother's arrearage.

## D. Father's Alleged Arrearage

While these matters were pending, the trial court entered an order requiring Father to pay temporary child support in the amount of $200 per week. Mother alleges that Father was in arrears on those payments. The trial court found that as of the time of the hearing, Father was current on child support with no

arrearage.  There is no evidence in the record that Father had an arrearage at the time of the hearing; therefore, the trial court did not err on this basis.[6]

## II.  Extracurricular Activities

## A.  Contempt for Alleged Failure to Pay

Next, Mother argues that the trial court erred by declining to hold Father in contempt for his alleged failure to pay his share of Child's extracurricular activities.  The parents' income ratio determines their share of the extracurricular activities.  Between November 30, 2015 (when the trial court entered an order changing the ratio), and August 18, 2017, when Mother filed her motion to modify the ratio, Father was to pay 52% of the cost and Mother was to pay 48%.

At the hearing, the parties stipulated that during that timeframe, the total amount of Child's extracurricular activities was $5,231.10, and that Father had paid $2,564.17.  The difference between what Father actually owed ($2,720.17) and what he paid was $156.  The trial court reviewed and weighed the evidence and found no indication that Father had willfully and wantonly disregarded the order requiring him to pay 52% of Child's extracurricular expenses.  Nothing in the record causes us to question this assessment.  Therefore, we decline to

---

[6] Mother seems to argue that while Father was not in arrears, his payments were frequently late.  She apparently believed that his payments were due on Wednesdays, while Father believed his payments were due on Fridays.  Regardless of that discrepancy, it is undisputed that Father was fully up to date in his obligation at the time of the hearing.

reverse the trial court's denial of Mother's request to hold Father in contempt with respect to extracurricular expenses.[7]

## B. Retroactivity of New Ratio

Next, Mother argues that the new ratio of their respective incomes should be applied retroactively to the date of her disability (nearly one year before she filed the motion to modify the payment of extracurricular activities). For the reasons expressed above regarding retroactivity of Mother's income with respect to her child support obligation, the trial court did not err by declining to do so.

## C. Modification of Decree

Mother next argues that the trial court erred by *sua sponte* modifying their decree of dissolution with respect to Child's extracurricular activities. Leading up to the modification, the trial court found as follows:

> 18.     . . . the child is now participating in way more numerous extracurricular activities than listed in the *Mediated Agreement*, including Goldfish, gymnastics, Spanish language (in addition to Lithuanian as set out in the *Mediated Agreement*), horseback riding, Grand Champion Equipment, village music, Shortee's golf, Chess, basketball, fishing frenzy camp, Minecraft Coding Camp, and fencing.

---

[7] Ultimately, the trial court deducted $156 from the amount of Mother's child support arrearage; therefore, the trial court ensured that Father's obligation was satisfied in full.

19.     Father testified that Mother had the child in extracurricular activities as many as 6 days a week at one point. . . .

20.     Father testified that he did not consent to some of the activities in which his child participated.  The child was enrolled in the protested activity anyway.  Father still paid for some of the activities despite his protest.

***

29.     There was significant evidence that Mother overuses the extracurricular activity provision in the parties['] *Mediated Agreement* despite the significant reduction in her income due to being adjudicated disabled.

Appealed Order p. 6, 8 (emphases original).  Based on these findings, the trial court ordered as follows:

9.     The Court orders ¶ 3.04 of the *Decree* is modified based on overreliance of Mother on the 'some other equivalent activity of the same or lesser cost' language in this provision.  The Court received bountiful evidence that the child has been placed in way more activities than were ever contemplated at the time of the *Decree*.  Moving forward for all activities for which the child is enrolled after the effective date of this order, Father shall only be responsible for those activities with which he consents *in writing* prior to enrollment.  Any interpretation of the parties or language in ¶ 3.04 of the *Decree* which requires Father to agree to a minimum of three activities at any one time is vacated.  Mother may choose to enroll the child in activities for which Father doesn't consent but she shall be

solely responsible for the costs of that activity without contribution from Father.

*Id.* at 38 (emphases original).[8]

[39] The decree of dissolution incorporated the parents' mediated settlement agreement. Generally, a trial court may modify a mediated settlement agreement in a family law case if it finds that the modification is in the child's best interests. *See Moell v. Moell*, 84 N.E.2d 741, 744 (Ind. Ct. App. 2017) (holding that settlement agreement involving child-related matters may be modified and that "the court's paramount concern" is "the best interests of the children").

[40] Here, while the trial court found that Mother was enrolling Child in more extracurricular activities than originally contemplated by the parties, the court *sua sponte* modified the parties' settlement agreement without making findings as to what is in Child's best interests. Therefore, we remand with instructions that the trial court consider what is in Child's best interests with respect to extracurricular activities and issue related findings and conclusions thereon.

---

[8] This issue would have been a much closer call had the trial court used the decree as a starting point by ordering that for every extracurricular activity *above and beyond* the three agreed-upon activities, Father has to consent in writing, but that he must still agree to (and help pay for) the first three. That, however, is not what the trial court's order says. In fact, it goes so far as to say that "[a]ny interpretation" of the original decree "which requires Father to agree to a minimum of three activities at any one time is vacated." Appealed Order p. 38.

# III. Child's Uninsured Medical Expenses

## A. Contempt for Alleged Failure to Pay

[41]     Mother contends that the trial court erred by denying her request to hold Father in contempt for his alleged failure to pay his share of Child's uninsured medical expenses. Mother is responsible for the first $907.92 of the uninsured medical expenses each year; after that, she pays 43% and Father pays 57%.

[42]     A determination of whether a party is in contempt is within the trial court's sound discretion, and we will reverse only where there has been an abuse of that discretion. *Bessolo v. Rosario*, 966 N.E.2d 725, 730 (Ind. Ct. App. 2012). An abuse of discretion occurs where the trial court's ruling is against the logic and effect of the facts and circumstances before the court. *Id.*

[43]     Mother proffered certain documents purporting to show the amount of Child's uninsured medical expenses from 2016 to 2018 as well as emails she claimed to have sent to Father seeking reimbursement. None of this evidence was admitted at trial and therefore does not support Mother's contention that the Father should be held in contempt.

[44]     Mother notes that she is a pro se litigant, but pro se parties are held to the same standards as attorneys. *E.g.*, *Goossens v. Goossens*, 829 N.E.2d 36, 43 (Ind. Ct. App. 2005). The simple fact of the matter is that the trial court had no admissible evidence to consider that supported Mother's claims. Therefore, the trial court did not err by denying Mother's request to hold Father in contempt on this basis.

## B. Contempt for Alleged Failure to Maintain

[45] Finally, Mother argues that the trial court should have held Father in contempt for his failure to maintain health insurance for Child during a time when he was court ordered to do so. In December 2015, the trial court ordered both parents to continue to carry health insurance for the Child because they each claimed that their policy was superior to the other's. When Father joined the law firm in 2015, he obtained health insurance as required. His policy was through the marketplace and he learned at some point that all of Child's healthcare providers were out of network on his plan. Because the policy was very expensive and did not provide useful coverage, he cancelled it. There is no evidence in the record as to when he cancelled it. In March 2018, Father purchased a new policy that covers emergencies, accidents, and dental and orthodontic work. It does not cover occupational, speech, or physical therapy.

[46] As for the gap in coverage, there is no evidence in the record as to how long of a gap it was. And nothing in the record causes us to second-guess the trial court's assessment that the reason Father cancelled his policy was related to changing marketplace plans and a change of employer. Given this record, we find no error with respect to the trial court's conclusion that Father did not willfully or wantonly disregard the December 2015 order. *See Bessolo*, 966 N.E.2d at 730.

[47] As for the quality of Father's current plan, we agree with the trial court that nothing in the December 2015 order required a specific type of coverage. As

such, there is no basis to hold Father in contempt for having a plan that does not cover occupational, speech, or physical therapy.

[48] We also note, as did the trial court, that Mother always had a health insurance policy in place that provided coverage to Child, meaning that there was no gap in coverage for Child. And Mother offered no admissible evidence tending to show that she paid more without Father's secondary coverage during the period when his coverage lapsed. The same holds true for her claim that Father failed to provide her with a health insurance card. For all these reasons, the trial court did not err by denying Mother's request to hold Father in contempt for failing to maintain health insurance coverage for Child.

# Conclusion

[49] The judgment of the trial court is affirmed and remanded with instructions to: (1) reconsider whether Father should be given an income credit for Child's tuition costs and make findings on the issue as directed herein; and (2) reconsider its modification of the extracurricular activities provision of the parties' mediated settlement agreement and make findings regarding Child's best interests as related to extracurricular activities.

Bailey, J., and Vaidik, J., concur.